719 So.2d 920 (1998)
Cherry Elaine KING, Appellant,
v.
Duane O. KING, Appellee.
No. 97-1928.
District Court of Appeal of Florida, Fifth District.
August 28, 1998.
Rehearing Denied October 5, 1998.
*921 Michael Sigman, Law Offices of Michael Sigman, Orlando, for Appellant.
Jon S. Rosenberg, Orlando, for Appellee.
PER CURIAM.
Cherry Elaine King ["wife"] appeals the final judgment dissolving her marriage to Duane O. King ["husband"]. They were married in 1967 and have two children, both of whom are adults. Wife brought the action for dissolution of marriage in 1994, seeking an equitable distribution of the parties' property, temporary and permanent alimony, an award of health and life insurance, and attorney's fees. Husband counter-petitioned for dissolution of marriage, alleging that both parties were capable of self-support and had relatively equal incomes, so that wife was entitled only to her share of the marital property.The fifty-one-year old husband was employed as a sergeant by the Orlando Police Department, earning approximately $50,000 per year. The forty-nine year old wife was working as a legal secretary, earning approximately $29,000 per year.
Following the filing of the petition, the parties participated in mediation and extensive settlement negotiations. The parties reached a mediated settlement in May 1995, which the court later refused to enforce. The parties then attempted to renegotiate the settlement. On several occasions, the parties appeared to reach agreements later repudiated by one or both of the parties.
By February 18, 1997, the court had decided to set the case for trial. In a letter to counsel, the court warned that it might well award attorney's fees against any party found to have "unreasonably obstructed settlements" or to have unreasonably repudiated a settlement. The court further warned that this could run in the "thousands of dollars, and could well run over $10,000 your client may have to pay to the apposing [sic] attorney, which will probably be a bitter pill to swallow." The letter indicated that otherwise all issues would be open for determination, explaining:
It may be that partition and sale of real estate will be necessary to make a distribution and pay all sums awarded, including attorneys fees and costs. I assume the pleadings will permit that or should be amended. As far as values of real estate, pensions and retirement benefits, neither of you will be bound by past stipulations. You may present evidence on any issue of value. Opinions usually vary widely on the present value of these. Of course, the costs of all of this expert testimony will be assessed against the party who unreasonably obstructed settlement, if that appears from the evidence.
The case went to trial on March 12, 1997.
The transcript reflects that the major assets at issue were real estate and retirement benefits. There were three major marital assets connected with husband's employment. The first was the husband's retirement plan. Husband testified at the final hearing that he planned to retire during the last half of 1997. As of the parties' separation, he had vested rights to a pension which equaled 68% of his average salary during the last three years of his employment.
The court valued the marital portion of the husband's pension plan at $206,000, apparently using the average of the salary the husband earned from 1991 through 1994, which was a total of $43,822, multiplied by 68% of the fund (the portion vested as of 1994), which would produce annual income of $29,799. The court then apparently multiplied *922 this by husband's life expectancy, and reduced that figure to a present value of approximately $300,000. The court then reduced this figure by approximately 32% percent, with the stated purpose of accounting for the "tax effect" of distribution. The court valued the husband's deferred compensation fund at $100,000, but took into account the taxes to be paid by husband (which was to be determined by an accountant to be hired by the parties), which the court assumed would leave a net award of $66,500.
Husband also had a deferred compensation plan or annuity, which involved monies accumulated during the marriage. Husband's original financial affidavit showed the balance on the account as $98,159 as of the separation. At trial, however, he testified that it had a value of $97,866 as of October 1994. As of the Monday before trial, the balance had risen to $107,800. Husband said these monies can be withdrawn either in one lump sum, or over a series of years (e.g. five or ten years), or over his remaining expected lifetime. The payments will be taxed at the husband's current tax rate as they are withdrawn. Husband testified that, at one point during settlement negotiations, they thought they could transfer the entire fund to his wife and that she would be able to pay the tax as the money was withdrawn. However, they later learned that this would not be possible.
Husband was also entitled upon retirement to collect accrued sick time. He testified that as of the hearing he had accrued 1500 hours, and that he would be compensated for up to 700 hours at the rate of $22.10 an hour. Counsel calculated that this would mean a payment upon retirement of $15,740.
The parties' principal debt was credit card debt. Husband's initial financial affidavit detailed credit card debts totaling $15,391.[1] Wife's original affidavit reflected these same debts. The financial affidavit submitted by wife the day before the hearing showed joint credit card debts of $29,537, an increase of nearly $15,000.[2] Wife had no first-hand knowledge of these accounts, however, since husband had had sole control of these cards since the separation and had rolled over several of the accounts. Husband's amended affidavit, submitted the day before trial, showed credit card liabilities of $21,508, an increase of approximately $6,000.[3] Husband's testimony regarding these debts was vague. He testified that of the debts listed on his later financial affidavit the following were joint debts: (1) Fleet Financial, $3,250; (2) Providian Bank Visa, $523; (3) Prudential Visa, $2,207; and (4) Optima, $4,698. He thought that the $4,889 shown on the MBNA MasterCard was "probably" a joint debt. He also testified that "say" $5,000 of the $6,210 due First U.S.A. Visa was a joint debt. He later also said that the parties' joint credit card debts could be determined by looking at the "amount of credit card debt that I agreed to pay back in May of '95," which was when mediation took place. However, the mediated settlement to which husband referred showed only $16,912 in credit card debts.[4]
The total marital estate was thus determined to have a value of $408,500. From this, the court deducted: (1) $36,000 in debts allegedly paid by the husband since the parties' separation (the amount was composed of $20,000 paid by the husband toward the Troy Road mortgage, $8,000 paid on the Altima loan and $8,000 in payments made on the credit cards), and (2) $29,500 in outstanding credit card debt. This left a net marital estate of $342,000, of which wife's share would have been $171,000. Wife was awarded a total of $166,000, which was comprised of the following: (1) $65,500, representing the parties' equity in the Troy Road house; (2) $66,500, representing the balance of the *923 husband's deferred compensation fund after payment of taxes (3) $13,000, which represented a $18,000 value for the Altima, less $5,000 of the loan payments made by husband since the separation; and (4) $21,500 in cash from husband, payable at the rate of $1,000 per month, with 8% interest, until fully paid.
Husband was awarded: (1) his entire pension plan, with an assigned present value of $206,000; (2) the Alleman Road property, with a net value of $50,000; (3) the parties' one-half interest in the boat, with a value of $2,000; and (4) the $5,500 in equity in the 1995 GMC truck. He was also awarded a minimum of $5,000 in attorney's fees, based on findings that "the Wife has unnecessarily and inappropriately delayed the proceedings, causing substantial expense and dissipation of marital assets."
The lower court erred in several aspects. First, the lower court erred in valuing the husband's pension plan. Although wife complains that $300,000 valuation made by the trial court is arbitrary and erroneous, it appears to be within the range of present values submitted by the accountants selected by the parties. The trial court did err, however, by reducing the present value of husband's pension by approximately one-third, in an apparent attempt to compensate for the future taxes which husband would have to pay on his distributions. Moreover, the record contains no indication that the parties ever submitted any evidence with regard to the taxes husband may have to pay on the distributions.
Wife also correctly contends that the trial court erred in failing to award her any portion of husband's accumulated sick leave in the final judgment. Wife failed to identify the number of hours accrued by husband as of the separation, but the burden of proof on this issue would appear to be on husband, who is effectively seeking a credit for sick leave accrued subsequent to the parties' separation.
In valuing the equitable distribution made to husband, the trial court also made a $29,000 adjustment for the joint credit card debts. As wife points out, husband's initial financial affidavit detailed credit card debts totaling $15,391. Wife's original affidavit reflected precisely these same debts. These affidavits, and the evidence that validated them, appear to be the best evidence of the parties' joint debts as of the separation. There is no substantial competent evidence to support the $29,000 figure. Husband may be entitled to a credit for the amounts he has paid towards the parties' joint credit card debts, but these amounts will have to be determined on remand.
As for alimony, the final judgment sets forth that the parties had "mutually waived" their respective claims for alimony during the settlement negotiations engaged in by the parties. This was error. The trial court set this case for trial because the parties were unable to reach a binding settlement. In the absence of a binding settlement, this case is controlled by the pleadings, in which wife specifically sought temporary and permanent alimony. Wife also made it clear during trial that she had not abandoned her claim to alimony, and that there had been no stipulation concerning this issue. During trial, the parties had the following discussion on this issue:
THE COURT: What difference does it make what the income is?
MR. SIGMAN [WIFE'S COUNSEL]: Well, it could affect the question of alimony at some point in time.
THE COURT: Is she seeking alimony?
MR. SIGMAN: Yes, sir.
MR. ROSENBERG [HUSBAND'S COUNSEL]: She waived it at a hearing, Your Honor, specifically.
MR. SIGMAN: No, no. That was predicated on a perceived settlement.
MR. ROSENBERG: Lots of things were predicated on perceived settlements, Your Honor.
THE COURT: So, she'sall right.
MR. ROSENBERG: We dispute her entitlement to alimony.
THE COURT: Okay. Well, if you're seeking alimony, fine. I guess we'll have to go into what the income is on the properties.
*924 Wife's final argument on appeal is that the trial court erred in awarding husband attorney's fees, based on findings that "the Wife has unnecessarily and inappropriately delayed the proceedings, causing substantial expense and dissipation of marital assets." Wife is correct that the record in this case fails to support the award.
Attorney's fees may be awarded as a punitive measure where a spouse in a domestic relations case institutes frivolous nonmeritorious claims that contribute to unnecessary legal expenses, costs and a delay of the proceedings. Crowley v. Crowley, 678 So.2d 435, 439 (Fla. 4th DCA 1996); Mettler v. Mettler, 569 So.2d 496 (Fla. 4th DCA 1990). However, the wife's actions, in the instant case, do not amount to "needless, futile and fruitless litigation," Mettler, 569 So.2d at 498, or to frivolous post-judgment motions, Sutter v. Sutter, 578 So.2d 788 (Fla. 4th DCA 1991), or to "baseless litigation," Pyszka, Kessler, Massey, Weldon, Catri, Holton & Douberley, P.A. v. Mullin, 602 So.2d 956 (Fla. 3d DCA 1992), rev. dismissed, 613 So.2d 7 (Fla.1993), or to an abuse of the judicial process. Thornton v. Byrnes, 537 So.2d 1088 (Fla. 3d DCA 1989). The record reflects no more than an inability of the parties to reach a final agreement, in part because of the complexities associated with distribution of the husband's retirement benefits. Consequently, the fee award is reversed.
AFFIRMED in part; REVERSED in part; and REMANDED.
GRIFFIN, C.J., and THOMPSON, J., concur.
PETERSON, J., concurs specially, with opinion.
PETERSON, Judge, concurring specially.
I concur with the majority opinion but wish to comment upon this court's reversal of the trial court's reduction of the husband's pension plan because of income tax considerations. I believe that it would have been appropriate to consider the impact of taxes had there been such evidence presented by a party and that the reduction would be fair to both parties. For example, if assets of the type that will incur income taxes are split evenly between parties who are in unequal income tax brackets, the after tax value to the higher tax bracket party is less than the party in the lower tax bracket. Fairness would require consideration of the impact of taxes on both parties rather than simply charging each party with one-half of the distribution at the gross value. If the one-half distributed to the individual in the higher bracket is valued without reduction for the tax impact, the distributed asset is worth less than one-half distributed to the individual in the lower bracket. It is only when both individuals are in the same income tax bracket that consideration of the tax impact becomes immaterial.
NOTES
[1] They included the following credit card debts: (1) Visa, $4,023; (2) American Express, $300; (3) MasterCard, $3,510; and (4) Visa, $7,558.
[2] They were: (1) Fleet Financial, $3,250; (2) Providian Bank Visa, $523; (3) First U.S.A. Visa, $6,210; (4) Prudential Visa, $2,027; (5) MBNA MasterCard, $4,889; (6) Optima, $4,698; (7) Colonial National Visa, $58; and (8) Citibank Visa, $7,882.
[3] He listed as credit card liabilities: (1) Optima, $4,549; (2) Visa, $3,042; (3) MBNA Visa, $4,554; and (4) First U.S.A. Visa, $9,363.
[4] The mediated settlement stated:

The husband will be responsible for payment of all marital debt (MC$5,870; VISA, $7,150; VISA, $3,892).